## BYXBEE v. DEWEY.

Sac. No. 35; December 15, 1896.

### 47 Pac. 52.

Replevin—Answer—Sufficiency of Denial.—A complaint alleged that plaintiff was the owner and entitled to the possession of certain personal property taken by defendant. The answer denied that plaintiff was "the owner in possession and entitled to the possession" of the property, and alleged that defendant was, and had been for a long time, the owner and in the possession of the property. Held, that the

affirmative averment was sufficient to negative the allegation that plaintiff was entitled to the possession.

**Sale—Change of Possession.—Defendant Purchased** of a debtor a number of raisin trays in payment of a debt. The trays were not removed from the shed on the debtor's farm where they were stored, but defendant wrote his name on a large number of them, and kept a man continuously at the debtor's house to look after the trays. Held, that there was no such open and continuous change of possession as would render the alleged purchase valid as against execution creditors of the vendor.[1]

APPEAL from Superior Court, Fresno County; Stanton L. Carter, Judge.

Action by J. O. Byxbee against Henry Dewey. From a judgment for defendant, plaintiff appeals. Reversed.

L. L. Cory for appellant; W. D. Grady for respondent.

PER CURIAM.—The plaintiff brought this action to recover the possession or value of eleven thousand raisin trays, more or less. The case was tried before a jury, and the verdict and judgment were in favor of defendant. The plaintiff moved for a new trial, which was denied, and has appealed from the judgment and order denying his motion.

Two propositions are relied upon and urged as grounds for a reversal. They are: (1) That the denials in defendant's answer were not sufficient to raise an issue as to plaintiff's right to recover possession of the property sued for; (2) that

---

[1] Cited and followed in Lemon v. Wolff, 121 Cal. 275, 53 Pac. 802, where the court said that one by merely marking certain sacks of beans and moving them to a different place in the barn did not acquire an interest in them, as against the creditors of the person affecting to sell.

Cited and followed in Davis v. Winona Wagon Co., 120 Cal. 247, 52 Pac. 488, to the effect that immediate delivery and change of possession is an indispensable element of a sale.

Cited in George v. Pierce, 123 Cal. 177, 56 Pac. 53 (where there had been a pledge of personal property and no delivery), as following Stevens v. Irwin, 15 Cal. 503, and the court say thereupon: "Indeed, at every milestone in the long road leading from volume 15 of the California Reports to volume 121, some case may be found indorsing, either by title or in principle, the doctrine of Stevens v. Irwin upon the sufficient delivery of personal property as against the claims of attaching creditors."

35

the purchase of the said property by defendant was not accompanied by an immediate delivery, and followed by an actual and continued possession thereof, as required by section 3440 of the Civil Code, and hence it was subject to seizure by a creditor of the seller. The complaint alleges that on the twenty-fourth day of June, 1893, the plaintiff was the owner and entitled to the possession of the personal property before mentioned, and that on said day the defendant, without the consent and against the will of the plaintiff, took said property from the possession of plaintiff and still retains the same. The answer "denies that heretofore, to wit, on or about the twenty-fourth day of June, 1893, plaintiff was the owner, in the possession, and entitled to the possession" of the personal property described in the complaint, and further "denies that heretofore, to wit, on or about the twenty-fourth day of June, 1893, the said defendant, without the consent of plaintiff and against his will, took the said trays from plaintiff's possession, and still withholds the same," and alleges "that said trays were at said time, and for a long time prior thereto, the property of the defendant and in his possession." And it further alleges, in a separate answer, and by way of cross-complaint, that on or about the first day of March, 1893, the defendant purchased the said trays from one William Applegarth, and thereupon took possession thereof, and ever since has been in the continuous possession of said property.

It is argued for appellant that the denials in the answer are conjunctively stated, and are therefore evasive and insufficient, and that, in effect, there is no denial of the averment that plaintiff was entitled to the possession of the property. The answer was not well drawn, but it must all be read together, and, when so read, we think it must be held sufficient. The affirmative averment that the trays were, and for a long time had been, the property of defendant, and in his possession, was sufficient to negative the averments of the complaint as to plaintiff's ownership and right of possession. "It is not essential that a traverse should be expressed in negative words. The averment in the answer of the contrary of what is alleged in the complaint has been held to be equivalent to a denial": Perkins v. Brock, 80 Cal. 320, 22 Pac. 194; Miller v. Brigham, 50 Cal. 615.

As to the second proposition, section 3440 of the Civil Code provides: "Every transfer of personal property . . . . is con-

clusively presumed, if made by a person having at the time the possession or control of the property, and not accompanied by an immediate delivery, and followed by an actual and continued change of possession of the things transferred, to be fraudulent, and therefore void, against those who are his creditors while he remains in possession," etc. The rule declared by this section was not new in this state when the codes were adopted. Substantially the same provision was found in the statute of frauds in 1860, when the case of Stevens v. Irwin, 15 Cal. 503, 76 Am. Dec. 500, was decided. In that case the court, in construing the meaning of the statute, said: "The delivery must be made of the property. The vendee must take the actual possession. That possession must be open and unequivocal, carrying with it the usual marks and indications of ownership by the vendee. It must be such as to give evidence to the world of the claims of the new owner. He must, in other words, be in the usual relation to the property which owners of goods occupy to their property. This possession must be continuous; not taken to be surrendered back again; not formal, but substantial. But it need not necessarily continue indefinitely, when it is bona fide and openly taken, and is kept for such a length of time as to give general advertisement to the status of the property and the claim to it by the vendee." And in Cahoon v. Marshall, 25 Cal. 198, the court, speaking of the same statute, said: "What constitutes an actual change of the possession of personal property, as distinguished from that which by mere intendment of law follows the transfer of title, is not of difficult solution. It is an open, visible change, manifested by such outward signs as render it evident that the possession of the vendor has wholly ceased." Since the above-mentioned decisions were rendered there have been numerous other decisions by this court to the same effect, and the rule is now firmly established that to constitute such a change of possession of personal property as will make the transfer valid against creditors of the vendor, there must be such a change of the apparent custody of the property as to indicate to the world that a change of ownership has taken place, and to put one dealing with the vendor with respect to the property upon inquiry as to its ownership.

The question, then, is, Was there such a change of possession of the trays in controversy as was required to make a valid transfer thereof as against a creditor of the former

owner? For the plaintiff it was proved that he purchased the trays on June 8, 1893, at a sale thereof made by the sheriff under and by virtue of a writ of execution issued on a judgment recovered by one Yancey against William Applegarth in the superior court of Fresno county, and that the trays were then stored in a dry-house and shed situated on a place occupied by Applegarth, about six miles west of Fresno. For the defendant Mr. Applegarth testified: "I sold the trays as they laid in the shed and dry-house to Henry Dewey on the twenty-fifth day of February. At the time of the sale I went with Mr. Dewey to the shed, and I said, 'There is your trays and your sweat-boxes,' and that was, I presume, all the actual delivery that was made. I don't know that Mr. Dewey did anything after that in reference to the trays. He stayed in the shed awhile, but went back to the house. I do not know of anything else being done. I owed Mr. Dewey a debt, and he said he wanted a settlement, and I sold him the trays. At that time I did not expect to have any opportunity to use the trays. I did nothing with the trays after the sale. I put Mr. Dewey in charge of them when I sold them to him. After the sale his son Charles came there, and, as I understood, was in charge. He stayed there until the property was sold, and I had no more control of the property, and then he went away. The trays remained there just the same as they did before and up to the time of the execution, and Mr. Dewey never attempted to take any of them away. I never saw him attempt to take any of them away. A while after I sold them I noticed there was a writing on some of them. Some of them had 'H. Dewey,' and some of them 'H. Dewey's trays.' I live in the house on the place where the trays were. I cultivated and took care of a part of the place. Where the trays are there is no cultivation. I exercised the same acts of ownership over the place as I did before. I lived there the same as before. Mr. Dewey's son came over there and did some work for me. He told me he was going to take charge of the trays. He ate and slept in my house, and was around the place generally during the day. He didn't stay near the trays any more than I did. There was nothing to indicate to anybody passing there that he was in possession of the trays any more than I was." The defendant testified that he lived in Riverdale, and was a vineyardist, and that he bought the trays of Mr. Applegarth in February, 1893. "They were in

Mr. Applegarth's shed at the time I purchased them. After the purchase, in the first place I marked them with a pencil—wrote my name on the outside of them; and in a few days I sent a man over there to take possession of them. It was high water at our place, so that I could not haul them away. The road was all under water, and I sent a man over there, and he stayed there about a month. . . . . I had two different men there, and I was there most of the time. I continued to hold this property, and, when they were going to take them away, I went over and nailed them up. I was there when they came after them, and prevented it. I was prevented from hauling them away at the time I purchased them because there was high water in our district. There was two miles of water, and it was impassable for heavy teams pretty near from the time I bought these trays until after they were seized, so that I could not haul those trays away. . . . . I had my son there to watch and keep the trays. My son Charles went there first. He stayed there, probably a month, in possession of the trays after I purchased them. I then sent John Dewey, who was there the balance of the time. . . . . The trays at that time (when the bill of sale was made) were all piled up in the shed and outside of the shed. They were in the same position there, piled there, when the execution was levied as when the bill of sale was made. I had not removed any of them. I couldn't. There was no flood around the trays. They could have been moved from there, but that would have been a big expense. There was no difficulty about moving the trays, but cost a good deal of money. It would have cost to take them to Riverside. I would have to take them there. It was a question of flood. I was not going to move them four or five times and wear them out. . . . . These trays were stacked in the dry-house, most of them inside, and about four hundred outside. I marked them by writing my name on them in lead pencil—'H. Dewey'—two hundred or three hundred of them; wrote on the edge of the trays. My son and I did that two or three days after the purchase.''

J. C. Dewey testified for defendant as follows: ''I am acquainted with the trays. On the 2d of March I went with father, and he surrendered the note, and marked the trays with the name of 'H. Dewey'—marked about four hundred trays. There were two rows of trays in the shed. The front row was in view, and I should think we marked about every

fourth or fifth tray with the name of 'H. Dewey,' and the same was true of the trays you could see in opening the doors. The ends of the trays presented themselves to view. One side there was not so many, but only the edges of the trays, and I think we marked those pretty thoroughly. I saw the note surrendered to William Applegarth. I was there off and on for a week or two. Father told me to just keep a lookout for the trays. My brother came about the 5th or 6th of April. I was there once, if not twice, when my brother was there continuously as keeper of the trays. . . . . I went away one day, and came back the next day, and I was there until the day before they were seized. I had some business to do up at Plainsburg, and when I came back I found I had left the day before they said the officer came and seized the stuff. . . . . I had an understanding with my father that I was there in charge of the trays, and I was there off and on until the day before they were seized. In reference to the trays, I watched them to see that no one touched or moved them off. . . . . The roads on the 2d of March were not bad, but the water was rising, and it raised afterward. It was a week or ten days before the water got up. It then went over the road and washed it out. We could always go by a spring wagon. It was some time in June before we could haul loads. I was there to see after the trays, and saw that no one touched them. Mr. Applegarth lived there in the house. I lived in the house, too. I had control, and he didn't. I watched the trays, and saw that nobody tried to move them. A person passing along the road would not see me in charge. . . . . There was nothing to indicate to anyone that there had been a sale or delivery of the trays, unless they came and asked about it. The writing on the trays would have indicated a change of possession, and that was the only difference there was after the sale and before. On March 1st the roads were good. The water was rising at the time.''

The above was, in substance, all of the testimony bearing upon the question in hand, and it was not, as it seems to us, sufficient to justify the verdict. It did not show such an immediate delivery and subsequent actual and continued change of possession as is required by the statute to make a transfer of personal property valid against creditors of the vendor.

The judgment and order appealed from are reversed and the cause remanded for a new trial.

McFARLAND, J.—I dissent. I think that the judgment should be affirmed.